UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------X
BTEC TURBINES, LP,            :
                              :
          Plaintiff           :
                              :
     v.                       :     NO. 3:03cv01207 (EBB)
                              :
THE CONNECTICUT LIGHT AND     :
POWER COMPANY,                :
                              :
          Defendant           :
                              :
------------------------------X
```

# RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS

## INTRODUCTION

This case is a suit for damages for breach of contract. Plaintiff, BTEC Turbines LP ("BTEC",) sued Defendant Connecticut Light & Co. ("CL&P") to recover under a contract that was terminated. In response, CL&P pled various affirmative defenses and asserted a Counterclaim alleging that BTEC breached and anticipatorily breached its contractual obligations. CL&P claimed damages of its own for this breach. BTEC's reply to CL&P denied the essential allegations of the Counterclaim and, on this Motion for Partial Summary Judgment, asserts that there is no genuine issue of material fact that the limitation of liability provision in the contract prevents CL&P from recovering the damages it seeks. For the following reasons, BTEC's Motion for Partial Summary Judgment [Doc. No. 58] is DENIED.

**FACTUAL BACKGROUND**

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The following factual summary is based on Plaintiff BTEC's Complaint ("Complaint"), Defendant CL&P's Counterclaim ("Counterclaim"), Plaintiff's Local Rule 56(a)1 Statement of Material Facts concerning its Motion for Partial Summary Judgment ["Pl.'s 56(a)1 Statement"], Defendant's Local Rule 56(a)2 Statement of Material Facts ["Def.'s 56(a)2 Statement"] and accompanying affidavits, depositions and exhibits. Consequently, the factual summary below does not represent the factual findings of the Court.

## I. Pre-Contract Activities

On or about February 20, 2003, CL&P solicited bids for the supply of emergency reliability power generation of electrical power to supply Southwestern Connecticut for the summer of 2003. It issued a second Request for Proposal (RFP) on March 21, 2003. BTEC, a company based in Houston, Texas that manufactures and supplies rebuilt gas fueled turbines used for the generation of electrical power, submitted a bid on March 28, 2003. This bid was for a 40 megawatt barge mounted facility to be docked in Stamford Harbor on the canal at the site proposed by CL&P and to be placed in operation by June 1, 2003. CL&P and BTEC representatives met on April 2, 2003 to discuss the bid.

A letter agreement dated April 4, 2003 ("Letter Agreement")

confirmed the selection of BTEC as the winning bidder. Pl. Ex. 7. The Letter Agreement also stated that "promptly upon the execution of this Letter Agreement by the Parties, BTEC will commence all the activities required to seek all permits, consents, filings and approvals . . . BTEC will proceed with the engineering, planning, and procurement activities necessary to have the Facility in place and operating by the date contemplated by the RFP." Id. The RFP contemplated June 1, 2003 as the in-service date. Pl. Ex. 1.

Prior to submitting its bid on March 28, 2003, BTEC's outside counsel at Murtha Cullina prepared a memorandum advising BTEC that obtaining the necessary permitting in time to have a generation unit installed and operational by June 1, 2003 was "highly unlikely . . . within CL&P's timeframe," but "possible under ideal conditions". Def. Ex. 33 ("Murtha Memo"). Sean Daichman[1], the chief financial officer for BTEC, testified that he did not tell anyone at CL&P about this memo, nor was he aware if anyone else from BTEC did. Daichman Dep. at 73-74.

BTEC arranged a site visit by its barge expert, Waller Marine, on April 7 and April 8, 2003. The report for this visit stated that "the canal at the site will require dredging for the power barge to be moored at the site without hitting bottom." Bates No. 003089.

On April 10, 2003, counsel and representatives for BTEC and

---

[1] Sean Diachman is employed as a vice president by Wedge Services, a investment firm that invests in energy service companies and real estate, and that invested in BTEC in 2001.

3

CL&P met with the Connecticut Department of Environmental Protection and other state officials. The barge mounted facility and the dredging issue were among the items discussed. Pl.'s 56(a)1 Statement ¶ 20.

**II. The Contract**

The contract between BTEC and CL&P (the "Contract") was executed on April 11, 2003. Pl. Ex. 8. Both BTEC and CL&P were represented by lawyers in the preparation and negotiation of the Letter Agreement, the Contract, and during all subsequent negotiations. Pl.'s 56(a)1 Statement ¶ 38.

Of particular relevance to this motion are the provisions of the Contract relating to termination of services and liability. Section 4.1 provided that neither party would be liable to the other for loss or damage resulting from any delay or failure to perform due to any event of Force Majeur.[2] Pl. Ex. 8. If BTEC were to terminate for cause under Section 6.3, Section 6.4 entitled BTEC to recover a Termination Charge as set forth in Attachment 1

---

[2]The Contract defines an event of Force Majeur as "any event or condition over which a party has no reasonable control, which delays, prevents, or forbids the performance of all or any part of such party's obligations under the Agreement and which is not caused by such party's negligence (including negligence in hiring or contracting), including without limitation any acts of God or public enemies, war insurrection, blockade, riot, epidemic, disease, strike, labor dispute, explosion, fire . . . failure to obtain or maintain any permits, licenses, approvals or orders from governmental authorities necessary for [BTEC] to perform its obligations under the Contract after using commercially reasonable and diligent efforts to obtain them . . ." Pl. Ex. 8.

4

of the Contract.[3]  In the event of nonperformance or breach by
BTEC, Section 6.2 permitted CL&P to cancel the Contract without
incurring liability, provided that it gave BTEC written notice and
allowed BTEC a reasonable time to remedy the deficiency.[4] Pl. Ex.
8.  Section 7.1 gave CL&P the right to terminate the Contract for
its convenience on one day's notice, but obligated it to pay BTEC
the Termination Charge set forth in Attachment 1 if it chose to
exercise this right.  Pl. Ex. 8.  Finally, Section 14 contained the
following limited liability provision:

> "Neither party shall be liable to the other party
> hereunder for any consequential, incidental, punitive,
> exemplary or indirect damages, lost profits or other
> business interruption damages, whether in contract, tort
> (including negligence and strict liability) or
> otherwise.  In no event shall Owner's [BTEC] liability
> to Utility [CL&P] hereunder exceed the amount of the
> Progress Payments and Fixed Cost Charges actually
> received by Owner."

## III. Post Contract Activities

On Friday April 11, 2003, at 5:57 PM, CL&P received a letter
from Department of Environmental Protection Commissioner Arthur
Rocque in which he stated that the "proposed solution to the
potential energy shortage is poorly conceived and we are dismayed

---

[3] Attachment 1 contains a schedule of Termination Charges to be paid by CL&P upon BTEC's termination for cause or CL&P's termination for convenience, sums which increase every 30 days. Within the first 30 days of the Contract award date, the sum was $2,550,000, minus any previously paid amounts. Pl. Ex. 8.

[4] If, however, BTEC's breach related to delay in achieving operational readiness, failure to generate or partial failure to generate, CL&P could not cancel the Contract, provided that BTEC paid liquidated damages specifically required by paragraphs 1,6, or 7, respectively of the Special Terms and Conditions to the Contract.  Pl. Ex. 8.

5

that [CL&P] would select an option that is so blatantly inconsistent with Connecticut's environmental standards." Pl. Ex. 11 ("Rocque Letter"). Specifically, the Commissioner noted that "the use of public trust waters and submerged lands to support an activity which is not a water-dependent use [as defined in CGS § 22a-93(16)] is clearly inconsistent with the policies and goals of Connecticut's Coastal Management Act (CCMA)." Id. Commissioner Rocque advised CL&P that "any application you may have considered submitting for dredging and mooring of a barge for this purpose will be looked upon unfavorably and will likely be denied," and expressed that he was "actually surprised that you have gone this far without having sought guidance from the department in advance. We could have advised you months ago and avoided unacceptable impacts as well as avoided the unnecessary urgency with which we are now responding to an energy issue about which we have all been aware for several years." Id. CL&P sent a copy of the Rocque Letter to BTEC's attorneys via fax on Monday, April 14, 2003.

On April 15, 2003, CL&P notified BTEC by telephone that it was suspending the Contract. CL&P confirmed this suspension in an April 16 letter where it stated:

> "As we discussed, in view of the substance of [the Rocque Letter], CL&P is very concerned about the ability to obtain required permitting for the barge-mounted project in sufficient time to provide meaningful emergency reliability generation in southwest Connecticut for the summer of 2003. While we plan to address the issues raised by the Commissioner in the short term, we have requested your proposal for a land

6

> based option as a possible alternative. It is my
> understanding that you will provide such a proposal as
> soon as possible via email . . ." Def. Ex. 15.

On April 17th, BTEC told CL&P by letter that a land based facility would cost an estimated $1.5 million more than the barge facility. Pl. Ex. 16. BTEC also estimated that the original schedule would need to be extended by three weeks in order to place the facility on land. Id. Both the cost and time estimates were contingent on a number of stated assumptions, including the assumption that once work was resumed, the permitting process would go smoothly. ("We also would expect that once we agree on the new contract terms and get the direction from you to proceed, that there will be no new hurdles in the permitting process. Any unexpected difficulties in the permitting process could delay the project."). Id. In addition, BTEC explicitly stated that "nothing in this letter constitutes a waiver of any of BTEC's rights under the contract as it currently exists. The price and schedule estimates stated above are not binding on BTEC until the amendments to the Contract are executed." Id.

A new Letter Agreement was executed on April 24, 2003. The purpose of this agreement was to "set forth [the Parties] mutual understandings regarding the implementation of the alternative proposal and the obligations of each [Party] until such time as the Contract is amended to reflect the implementation of the alternative proposal." Pl. Ex. 17 ("April 24th Letter Agreement").

7

The agreement set April 29, 2003 as the expiration date for contract negotiations, and provided that if the Contract Amendments were not executed by that date, CL&P would reimburse BTEC for enumerated expenses for engineering, procurement, development, permitting, equipment purchases and renegotiation activities up to a reimbursement cap of $850,000. Except where specifically amended and supplemented by the April 24th Letter Agreement, the Contract remained in full force and effect. Id.

CL&P and BTEC were unable to agree on terms for the Contract Amendments by the April 29, 2003 expiration date. On April 30, 2003, CL&P negotiated a contract with Waterside Power LLC for the supply of emergency reliability power generation for the summer of 2003. That contract was executed on May 1, 2003, and the contract price was $8.3 million.

On May 1, 2003, CL&P informed BTEC via letter that it would not be pursuing the land-based option with them. Pl. Ex. 20. The next day, BTEC sent CL&P a letter advising them that it was seeking $571,255 as reimbursement for the enumerated expenses outlined in the April 24th Letter Agreement. Pl. Ex. 18. CL&P responded on May 7, 2003, declining BTEC's request for payment and arguing that it would not have entered into the April 24th Letter Agreement but for BTEC's alleged representation that the land based project would be completed by June 15, 2003. Pl. Ex. 23. On May 9, 2003, CL&P wrote to BTEC cancelling the Contract. Bates No. D000017 The

letter also stated CL&P's refusal to pay the termination charges[5] under the Contract, arguing that BTEC's representation that it would not be able to meet the June 15, 2003 deadline was an anticipatory breach of the contractual agreement. Id. Finally, the letter demanded a refund of the $200,000 that CL&P paid to BTEC under the April 24th Letter Agreement, asserting that CL&P had executed the agreement based upon BTEC's alleged misrepresentations about its ability to meet a June 15th in-service date. Id.

In its Complaint, BTEC claimed that CL&P terminated the Contract "for convenience", and as such, BTEC is entitled to collect $2,550,000 pursuant to the fixed-sum schedule for terminations for convenience set forth in the Contract, less payments already made by CL&P ($500,000), for a total net due of $2,050,000. [Doc. No. 5]. According to BTEC, CL&P's refusal to pay this Termination Charge constitutes a breach of the Contract.

CL&P answered BTEC's amended Complaint by denying that it breached the Contract, and pleading affirmative defenses that it asserted would void the limitation of liability clause in the Contract and/or excuse its obligation to comply with that

---

[5]The Termination for Convenience Fee provided in Attachment 1 to the April 11, 2003 Contract was $2,550,000 if the Contract was terminated within the first 30 days after it was awarded, "minus any previously paid amounts, plus any termination charges or non-cancelable fixed charges imposed on Owner [BTEC] by Yankee Gas relating to the natural gas supply or transportation for the Resource."

provision.[6] [Doc. No. 16]. In addition, CL&P asserted a Counterclaim alleging that BTEC breached and anticipatorily breached the Contract, causing CL&P to suffer losses and damages in the amount of $3,417,000[7].

BTEC has moved for partial summary judgment on the issue of damages recoverable by CL&P on its Counterclaim. It denies the allegations of the Counterclaim and asserts as an affirmative defense that the Contract's limitation of liability provision precludes CL&P as a matter of law from recovering the consequential and/or incidental damages sought in the Counterclaim. In the memorandum accompanying its motion for partial summary judgment, BTEC adds that CL&P's potential recovery, if any, is limited to the amount of the Progress Payments and Fixed Cost Charges actually received by BTEC.

## DISCUSSION

**I. Standard of Review**

The standard for summary judgment is well established. A moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is

---

[6]Defendant asserts the following affirmative defenses: (1) Plaintiff's breach of contract, (2) the force majeure provision, (3) estoppel, (4) waiver, (5) mutual mistake, (6) unilateral mistake, (7) fraud in the inducement, (8) unclean hands, (9) misrepresentation, (10) failure to mitigate and (11) failure to state a claim upon which relief may be granted. [Doc. No. 16].

[7]This represents the difference between CL&P's contract price with BTEC ($5.4 million) and what it ultimately paid to Waterside LLC to complete the work ($8,317,000), plus recovery of the $500,000 it paid to BTEC.

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law", while an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); <u>see also</u> <u>Konikoff v. Prudential Ins. Co. Of Am.</u>, 234 F.3d 92, 97 (2d Cir. 2000). Upon motion, and following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." Fed. R. Civ. P. 56(c). The evidence of the non-moving party is to be believed, <u>Anderson</u>, 477 U.S. at 255, 106 S.Ct. at 2513, and "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962). However, the non-movant may not rest upon the mere allegations or denials of his pleading, see Fed. R. Civ. P. 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts."

11

Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

**II. Application of Standard of Review**

BTEC asserts that there is no genuine issue of material fact that (1) the limitation of liability provision prevents CL&P from recovering the damages sought in the counterclaim and (2) CL&P's potential recovery on the counterclaim, if any, is limited as a matter of law to the amount of the Progress Payments and Fixed Cost Charges actually received by BTEC. Pl. Mot. in Supp. of Partial Summ. J. at 1-2.

Whether CL&P can prove its counterclaim that BTEC anticipatorily breached is immaterial to the resolution of this motion. The narrow issue before the Court is whether, even assuming BTEC anticipatorily breached the Contract, the limited liability provision nonetheless bars CL&P from recovering damages for its losses.

The Court finds that a ruling on the enforceability of the limited liability provision would be premature, in light of the affirmative defenses raised by CL&P. These affirmative defenses, if proven at trial, might impact the validity of the limited liability provision and the Contract as a whole. Thus, although

12

CL&P did not incorporate these affirmative defenses into its Counterclaim, the Court cannot rule on the applicability of the limited liability provision until a trier of fact determines whether CL&P's affirmative defenses are valid.

There are numerous disputed material facts underpinning the parties' respective breach of contract claims and CL&P's affirmative defenses. These facts, if resolved in Defendant's favor, might preclude Plaintiff from invoking the limitation of liability provision.

For example, CL&P asserts an affirmative defense of fraud in the inducement and alleges that there are genuine factual disputes as to whether BTEC knowingly provided CL&P with false information about (1) its ability to obtain the necessary permits and governmental approval in time, (2) the need to dredge the Stamford Harbor and (3) its ability to have its land-based alternative project ready by June 15, 2003.

Fraudulent inducement is a question of fact. <u>Dorsey v. Mancuso</u>, 23 Conn. App. 629, 633, 583 A.2d 646, 648 (1990). To prevail on a fraudulent inducement claim, a party must establish that (1) a false representation was made as to a statement of fact, (2) the statement was untrue and known by the defendant to be untrue, (3) the statement was made to induce the plaintiff to act, and (4) the plaintiff acted on the false representation to its detriment. <u>Id.</u>, <u>citing</u> <u>Kavarco v. T.J.E., Inc.</u>, 2 Conn. App. 294,

295-96, 478 A.2d 257 (1984).

Here, CL&P alleges that BTEC represented that it "understood the [permitting] process and would nail it," Fortier Dep. at 64, even though BTEC knew it could not obtain the necessary permits in time to meet the June 1st in-service date contemplated in the original Contract. Although BTEC admits that its outside counsel had advised it that obtaining the permits would be "highly unlikely", Def. Ex. 33; Boyce Dep. at 133-34, it also contends that its discussions at CL&P led to believe that the Murtha Memo was unduly pessimistic, and that CL&P had contacts with permitting agencies that would make the process go smoothly. Boyce Dep. at 164, 166, 172.

The parties also dispute the representations made about the need for dredging. Jerry Fortier, a project manager at CL&P, testified that during a site visit on April 3, 2003, BTEC President Phiroz Boyce represented that the water depth of the canal would not be a problem, and that dredging would most likely not be required. Fortier Dep. at 71-72. Boyce admitted that he "knew" as of April 2, 2003 that the dredging of the Stamford Harbor would "probably be required" in order to accommodate BTEC's barge-mounted facility, but denied that he told Fortier that water depths would not be problem. Boyce Dep. at 149, 220.

Finally, the parties dispute whether BTEC provided false information to CL&P about BTEC's ability to have a land-based

14

alternative generation facility operational by June 15, 2003. CL&P alleges that an April 19th email sent from its counsel to BTEC's counsel, stating that CL&P was under "considerable pressure" from ISO New England[8] to have the generation unit in place by June 15th Bates No. D001357, made BTEC aware of the importance of the deadline. In addition, an April 23rd email from BTEC provided CL&P with a draft project schedule showing a June 15th in-service date. Bates No. D0013578. CL&P argues that it relied on BTEC's alleged representations that it could meet a June 15, 2003 deadline when it entered into the April 24th Letter Agreement. However, BTEC alleges that it told CL&P before entering into the April 24th Letter Agreement that a June 15th in-service date would be unlikely. It contends that CL&P said it needed the agreement to state June 15th in order to appease ISO New England, but that BTEC could simply pay liquidated damages if it did not meet the deadline. Boyce Dep. at 276-77.

The factual disputes above are genuine, and are material to CL&P's claim that BTEC fraudulently induced it to enter into the Contract. Viewing the facts in the light most favorable to CL&P could support its claim of fraudulent inducement, which could void the limited of liability provision. See, e.g. Turkish v. Kazentz, 27 F.3d 23, 27-28 (2d Cir. 2005) (stating that "it is well settled

---

[8] ISO New England is a regional transmission organization that supplies electricity to Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

15

that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct.").

In addition, CL&P also asserts the affirmative defense of mutual mistake. A mutual mistake is one that is common to both parties and effects a result that neither intended. <u>Lopinto v. Haines</u>, 185 Conn. 527, 532, 441 A.2d 151, 155 (1981). Mutual mistake is a question of fact. <u>Rodriquez v. State</u>, 76 Conn. App. 614, 624-25, 820 A.2d 1097, 1104 (2003). Mutual mistake may justify rescission of a contract "in a proper case where the mistake is common to both parties and by reason of it each has done what neither intended." <u>Buol Machine Co. v. Buckens</u>, 146 Conn. 639, 153 A.2d 826 (1951); <u>see</u> <u>also</u> Restatement (Second) Contracts § 152(1) (stating that "where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake").

Here, CL&P argues that establishing this affirmative defense requires a showing that CL&P and BTEC entered into the Contract based upon the same mistaken understandings of the permitting process and whether or not dredging was required. Pl. Mot. in Supp. of Partial Summ. J. at 32.

As noted above, genuine issues of fact exist regarding what

16

the parties believed at the time of contract regarding the possibility of obtaining the necessary permits in time and the need for dredging the Stamford Harbor. Were CL&P to prove the parties were mutually mistaken, these misunderstandings would have had a material effect on the Contract, which contemplated a June 1st in-service date on the assumptions that there would be no need for dredging and that the permitting process would go smoothly. Thus, the parties mutual mistake could justify a rescission of the Contract, including the limited liability provision.

In sum, because CL&P has challenged the validity of the Contract as a whole, the Court cannot determine whether CL&P is bound by the limited liability provision until the trier of fact resolves the genuine issues of material fact underlying CL&P's affirmative defenses.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [Doc. No. 58] is hereby DENIED.

SO ORDERED

　　　　　　　　　　　　　　　　/S/　　　　　　　　　　

ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this          day of October 2007.

17